# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| BRAD A. MART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:10 CV 118 |
| | ) | |
| FOREST RIVER, INC., | ) | |
| PETER J. LIEGL, and | ) | |
| BERKSHIRE HATHAWAY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Defendants Forest River and Peter Liegl ("the FR defendants") have moved to dismiss several of plaintiff's claims under FED. R. CIV. P. 12(b)(6) (DE # 27) and FED. R. CIV. P. 12(b)(1) (DE # 29). Defendant Berkshire Hathaway ("Berkshire") has also moved to dismiss plaintiff's claims against it under FED. R. CIV. P. 12(b)(1), FED. R. CIV. P. 12(b)(2), and FED. R. CIV. P. 12(b)(6). (DE # 32.) In his amended complaint, plaintiff brought six claims in total. (DE # 5 at 15-21.) Count One is a breach of contract claim against Forest River. (*Id.* at 15-16.) Count Two is a Sarbanes-Oxley Act claim against each of the defendants. (*Id.* at 16-18.) Count Three is a retaliatory discharge claim against Forest River. (*Id.* at 18-19.) Count Four is a negligent misrepresentation claim against each of the defendants. (*Id.* at 19-20.) Count Six is a claim against Forest River alleging violations of the Family Medical Leave Act. (*Id.* at 20-21.) Finally, Count Seven is a defamation claim against the FR defendants. (*Id.* at 21.) The court will address each of these motions in turn.

## FACTUAL BACKGROUND[1]

Plaintiff Brad Mart sold real estate to defendant Peter Liegl in 2000, and the two later became friends. (DE # 5 at 5.) At that point Liegl was, and still is, the CEO of defendant Forest River. (*Id.* at 1.) In 2005, Mart analyzed defendant Forest River's business to develop strategic alternatives for Liegl. (*Id.* at 5.) During this time, Mart came to believe that Forest River was the type of company that defendant Berkshire would find attractive. (*Id.*) With Liegl's permission, Mart submitted a business overview of Forest River to Berkshire CEO Warren Buffet, and in August of 2005, Berkshire purchased Forest River, making Forest River a wholly owned subsidiary of Berkshire. (*Id.*)

After the acquisition, Liegl hired Mart to be the general manager of Forest River Financial Services, a new business unit at Forest River. (*Id.* at 6.) In the fall of 2007, Liegl told Mart that he (Liegl) was planning to retire, and asked Mart to take over as the CEO of Forest River. (*Id.* at 7) This move would have required Mart to move his family from Illinois to Indiana. (*Id.*) Although Mart was hesitant, Liegl eventually convinced Mart to take the position, and on October 31, 2007, Mart accepted the position of CEO of Forest

---

[1]     For purposes of deciding defendants' RULE 12(b)(6) motions, the court accepts plaintiff's factual allegations as true. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

River. (*Id.*) He entered into a written agreement[2] with Liegl and Forest River to become

the CEO of Forest River, effective immediately. (*Id.*)

---

[2]     The text of that written agreement is as follows:

Mart Employment Agreement
CEO, Forest River
October 31, 2007

Timing:                Effective October 31, 2007

Annual Salary:      $175,000 per year

Bonus:          Forest River CEO annual bonus equal to 10% of the amount of
                Forest River's Profits in excess of $90 million.[FN1] For 2008,
                bonus guaranteed to be no less than the bonus Mart would
                have earned that year as General Manager of Forest River
                Financial Services.

                [FN1]: The profit calculation will exclude federal and state
                income taxes and Berkshire management fees and other
                Berkshire allocations or similar charges, if any, as well as
                amortization and/or depreciation of any purchase accounting
                adjustments recorded in connection with Berkshire's
                acquisition of Forest River, and such calculation shall be made
                using accounting principles consistent with past practices.

Relocation:     Forest River to pay real estate agent fees and closing costs
                associated with selling the Mart family house in Elmhurst, IL.
                Forest River to pay moving expenses associated with moving
                the Mart family from Elmhurst, IL to the Elkhart area.

(DE # 5-1 at 1); *see also Reger Devel., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) ("We consider documents attached to the complaint as part of the complaint itself.").

After accepting the position, Mart bought a house in Granger, Indiana. (*Id.*) From November 2007 to February 2008, Mart approached Liegl several times to discuss his transition to the CEO position, but Liegl refused to discuss the matter. (*Id.* at 8.) Mart eventually posed two questions directly to Liegl: (1) "Are you still planning to retire at the end of 2008?" and (2) "Are you still planning for me to be CEO?" (*Id.*) Liegl responded to both questions with "hell yes." (*Id.*) After getting this affirmation, Mart hired a contractor to make significant renovations to the home he had purchased in Granger, and on July 18, 2008, Mart and his family moved to Granger to live in the renovated home. (*Id.*)

During the Fall of 2008, Mart discovered that Forest River, acting through Liegl, and at least two other "shadow-companies" owned by Liegl, were engaging in unlawful transactions. (*Id.* at 9.) Mart realized that Liegl had been siphoning money from Forest River through a series of unlawful maneuvers. (*Id.*) Mart began to question this conduct, and got "pushback" from Liegl. (*Id.* at 10.) Mart believed some of this conduct violated federal law. (*Id.*) He also believed some of this conduct to be in violation of the Berkshire Hathaway Code of Business Conduct and Ethics (the "Code") (DE #93-1 at 12), and reported the conduct to Buffet. (DE # 5 at 11.)

In late 2008, Mart reported the violations to Buffet during a series of phone calls. (DE # 5 at 11.) During one of these phone calls, Buffet told Mart that only he (Buffet) had the authority to hire and fire the CEO of a Berkshire subsidiary. (DE # 94 at 3.) Buffet also told Mart that Mart would be made whole as a result of his reliance on the

October 31, 2007, agreement. (*Id.*) Buffet made it clear to Mart that he should discuss these issues with Liegl, and that Mart and Liegl might have to resolve these issues by going to Omaha, with either Mart or Liegl likely not working at Forest River after that meeting. (*Id.*) During one of these conversations, Mart told Buffet he planned to meet with Liegl that same day, and Buffet wished him luck. (*Id.* at 3-4.)

After informing Buffet about the improprieties, Mart confronted Liegl directly. (DE # 5 at 11.) Liegl responded by verbally abusing Mart, including threatening Mart's life. (*Id.*) After that encounter, Liegl began subjecting Mart to a hostile work environment. (*Id.*) Mart would not have approached Liegl if he had not received the assurance from Buffet that he would be made whole, and his belief that he would be protected by the Code. (DE # 94 at 4.) After Mart confronted Liegl, Buffet was no longer willing to discuss these matters with Mart. (DE # 5 at 15; DE # 94 at 4.) Despite these conversations, Buffet took no action after learning about this conduct. (DE # 5 at 11.)

In October 2008, Liegl made a company-wide announcement that Mart was taking over as "President" of Forest River. (*Id.* at 12.) This position did not previously exist, and Mart had been under the impression that he was sharing the role of CEO with Liegl until Liegl retired at the end of 2008. (*Id.*) Mart and Liegl sat down for a meeting on October 9, 2008, to discuss Mart's transition into the CEO position. (*Id.*) However, the meeting became heated, and Liegl refused to discuss the matter further. (*Id.*) Finally, in a letter from Forest River dated November 19, 2008, Mart was informed he was being terminated. (*Id.*)

## LEGAL STANDARD[3]

Defendants have moved to dismiss plaintiff's claims under RULE 12(b)(6) of the FEDERAL RULES OF CIVIL PROCEDURE for failure to state a claim upon which relief may be granted. RULE 8 of the FEDERAL RULES OF CIVIL PROCEDURE sets forth the pleading standard for complaints filed in federal court; specifically, that rule requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8. "The RULE reflects a liberal notice pleading regime, which is intended to focus litigation on the merits of a claim rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross,* 578 F.3d 574, 580 (7th Cir. 2009) (internal quotation marks omitted). "While the federal pleading standard is quite forgiving . . . 'the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Ray v. City of Chicago,* 629 F.3d 660, 662-63 (7th Cir. 2011) (quoting *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 463 (7th Cir. 2010)); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 570 (2007).

## PLAINTIFF'S STATE LAW CLAIMS

### I.     The Forest River Defendants' Motion to Dismiss

The FR defendants have moved to dismiss plaintiff's state law claims: breach of contract, retaliatory discharge, negligent misrepresentation, and defamation. (DE # 27.) In his response brief, plaintiff agrees to drop his retaliatory discharge and defamation

---

[3]     This standard applies to the FR defendants and Berkshire's motions to dismiss under RULE 12(b)(6).

claims. (DE # 93 at 2.) Therefore, only the breach of contract and negligent misrepresentation claims remain on this motion to dismiss.

## A. Plaintiff's Response Brief

As an initial matter, the FR defendants contend that Mart, in his response brief to the FR defendants' motion to dismiss, improperly alleges new theories of contractual liability. (DE # 100 at 5-6.) The FR defendants allege that Mart has essentially amended his amended complaint through his response brief. (*Id.*)

"[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984); *see also Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss . . . .") However, plaintiff has not improperly amended his amended complaint here because he has simply alleged new theories about his breach of contract claim. *Milazzo v. O'Connell*, 925 F. Supp. 1331, 1340 (N.D. Ill. 1996).

In *Milazzo*, the plaintiff brought an action claiming a violation of her procedural due process rights after she was terminated from her job working at a county circuit court. *Milazzo*, 925 F. Supp. at 1336-37. The plaintiff had originally claimed a property interest in continued employment because her employer's employee handbook provided for a hearing prior to the discharge of an employee. *Id.* at 1337. But in her response brief to the defendant's motion to dismiss, the plaintiff changed her property

interest theory by claiming that her property interest in continued employment arose out of an oral promise of continued employment from her supervisor. *Id.* at 1339.

In *Milazzo*, similar to the case at hand, the defendants argued the plaintiff should not be allowed to "assert new facts to bolster her complaint in her response" to the motion to dismiss. *Id.* The court allowed the plaintiff to assert these new facts, stating:

> We find the words of Judge Easterbrook in *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992), instructive here: "A complaint under Rule 8 limns the claim; details of both fact and law come later, in other documents." We believe this approach harmonizes best with the spirit of the Federal Rules of Civil Procedure. Milazzo's complaint adequately describes her procedural due process claim, and she is not forbidden from alleging new facts, or *even new legal theories* about *that claim*, in her response brief.

*Id.* at 1340 (emphasis added).

In contrast, the FR defendants cite *Cast Group of Companies, Inc. v. Electronic Theatre Controls, Inc.*. No. 08-cv-753-bbc, 2009 WL 2780150, at *3 (W.D. Wis. Aug. 27, 2009). In *Cast*, the plaintiff asserted claims in its complaint for both negligent and intentional misrepresentation. *Id.* In responding to the defendant's motion for summary judgment, the plaintiff in *Cast* did not address the defendant's argument about the misrepresentation claim. *Id.* at *3. Instead, the plaintiff asserted an entirely new claim: that defendant fraudulently induced plaintiff into entering a contract. *Id.* The plaintiff in *Cast* acknowledged that its complaint did not include the fraudulent inducement claim, and stated it would eventually seek leave to amend its complaint. *Id.* at *3. The court refused to allow plaintiff to do this and granted defendant's summary judgment motion

for the intentional misrepresentation claim, stating: "Plaintiff's use of the words 'intentional misrepresentation' in the complaint does not give plaintiff license to advance any set of allegations at summary judgment that might fall under that general concept. Further, it is far too late now for plaintiff to amend its complaint to raise completely new issues." *Id.* at *4.

The FR defendants argue that plaintiff introduces three entirely new theories of liability in his response brief: promissory estoppel, adequate independent consideration, and a claim based on *Bochnowski v. Peoples Federal Savings & Loan Ass'n*, 571 N.E.2d 282 (Ind. 1991).[4] (DE # 100 at 5.) Although the FR defendants concede that plaintiff has pleaded enough facts to state a promissory estoppel claim (*Id.* at 5 n.2), they still argue that plaintiff's adequate independent consideration and *Bochnowski* claims are improper. (DE # 100 at 5-6.) As to the adequate independent consideration claim, it is unnecessary to decide whether plaintiff has improperly alleged this theory, because, as set forth in more detail later in this opinion, the claim fails on its merits. The court also believes the *Bochnowski* claim can proceed.

The Seventh Circuit has stated: "Rule 8(a) of the Federal Rules of Civil Procedure says that a complaint must identify the basis of jurisdiction and contain 'a short and plain statement of the claim showing that the pleader is entitled to relief'" and that the "complaint need not identify a legal theory, and specifying an incorrect theory is not

---

[4]     Although *Bochnowski* is not mentioned anywhere in plaintiff's amended complaint, the *Bochnowski* argument is a breach of contract claim based on the Employment Agreement ("the Agreement"). (DE # 93 at 11-13.)

fatal." *Bartholet*, 953 F.2d at 1077-78. In his amended complaint, plaintiff alleges facts indicating a breach of contract claim based on the Agreement. (DE # 5 at 15-16.) Unlike in *Cast*, this is not an entirely new claim. This is simply a different theory for the breach of contract claim based on the Agreement. Although plaintiff did not explicitly set out the *Bochnowski* argument in his amended complaint, he was not required to do so. *Bartholet*, 953 F.2d at 1077-78. Therefore, the court finds that the *Bochnowski* argument was not improperly alleged and can proceed on its merits.

### B.    Plaintiff's Status As an At-Will Employee

In their motion to dismiss, the FR defendants first argue that plaintiff's claim for breach of contract based on the Agreement was insufficient on its face because it did not meet the four elements of an employment contract under Indiana law, and because the Indiana Statute of Frauds prevented parol evidence from supplying the missing element. (DE # 30 at 4-7.) The FR defendants argue that because the Agreement does not meet the four-element test, plaintiff was an at-will employee and could be discharged without just cause.[5] (*Id.* at 5.)

Plaintiff responds by claiming that he was not an at-will employee because of two exceptions to the at-will employment doctrine under Indiana law. (DE # 93 at 4-9.) He also contends that the anti-retaliation provision of the Code created a unilateral contract between Berkshire, Forest River, and plaintiff. (*Id.* at 5-6.) Finally, plaintiff

---

[5]    As discussed later in this opinion, the FR defendants also argue that plaintiff's negligent misrepresentation claim cannot survive because he was an at-will employee. (DE # 30 at 12-13.)

argues that his contract was terminable, not terminated, in October 2008, thus making the at-will doctrine inapplicable to defendants' breach. (*Id.* at 11-13.)

The court will begin its analysis of the breach of contract claim by analyzing whether plaintiff was an at-will employee. Under Indiana law, "[t]he determination of whether an employee is at-will is a legal determination." *Bee Window, Inc. v. Turman*, 716 N.E.2d 498, 500 (Ind. Ct. App. 1999). Plaintiff argues that because two exceptions to the at-will doctrine apply to his case, adequate independent consideration and promissory estoppel,[6] he was not an at-will employee. (DE # 93 at 4-9.) The FR defendants argue that none of plaintiff's legal theories in his response brief change his at-will status. (DE # 100 at 7-11.)

"When interpreting state law, a federal court's task is to determine how the state's highest court would rule." *Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011). It is also proper for a federal court to defer to state appellate courts, unless there is a "persuasive indication[ ] that the state supreme court would decide the issue differently." *Id.* (quoting *Allstate Ins. Co. v. Tozer,* 392 F.3d 950, 952 (7th Cir. 2004)).

Under Indiana law, there are two basic types of employment: "(1) employment for a definite or ascertainable term; and (2) employment at-will." *Orr v. Westminster Vill. N., Inc.*, 689 N.E.2d 712, 717 (Ind. 1997). In *Orr,* the Indiana Supreme Court stated: "[I]n Indiana, the presumption of at-will employment is strong . . . ." *Id.* at 717-18 (citing *Wior*

---

[6]     The FR defendants concede that plaintiff can survive the motion to dismiss on a claim for promissory estoppel. (DE # 100 at 5 n.2.)

*v. Anchor Industries, Inc*, 669 N.E.2d 172, 177 & n.5, 178 (Ind. 1996)). However, in that same case, the Indiana Supreme Court summarized three exceptions that can rebut the presumption of at-will employment in Indiana: adequate independent consideration, public policy, and promissory estoppel. *Id.* at 718.

"[I]n order to convert employment at will to employment requiring good cause for termination, 'independent consideration supplied by the employee, which results in detriment to him and a corresponding benefit to the employer, must be given in return for permanent employment.'" *Orem v. Ivy Tech State Coll.*, 711 N.E.2d 864, 870-71 (Ind. Ct. App. 1999) (quoting *Hamblen v. Danners, Inc.,* 478 N.E.2d 926, 928 (Ind. Ct. App. 1985)). The Indiana Supreme Court has noted:

> [A]n employer cannot arbitrarily fire an employee when (1) the employer knows the employee had a former job with assured permanency (or assured non-arbitrary firing policies) and (2) was only accepting the new job upon receiving assurances the new employer could guarantee similar permanency. . . . [G]ood cause *must* be shown in order to terminate such an employee . . . .

*Romack v. Pub. Serv. Co. of Ind.*, 511 N.E.2d 1024, 1025-26 (Ind. 1987) (emphasis in original) (adopting and incorporating *Romack v. Pub. Serv. Co. of Ind.*, 499 N.E.2d 768, 776-79 (Ind. Ct. App. 1986) (Conover, J., dissenting)). The circumstances in which Indiana courts have found this exception satisfied have been limited. In *Urbanski v. Tech Data*, the court summarized the cases where the exception has been met:

> Indiana Courts have identified fact scenarios in which the employee's act or forbearance might provide adequate independent consideration sufficient to support an employment contract terminable only for good cause. *See Romack v. Public Service Co.,* 511 N.E.2d 1024 (Ind. 1987) (an employee surrendering

12

his own permanent employment with the express understanding that he would not do so except for assurance from employer of receiving the same protections in the new job could provide adequate consideration); *Ohio Table Pad. Co. v. Hogan,* 424 N.E.2d 144, 146 (Ind. Ct. App. 1981) (an employee abandoning his own competing business could provide adequate consideration); *Mt. Pleasant Coal Co. v. Watts,* 91 Ind. App. 501, 151 N.E. 7 (Ind. Ct. App. 1926) (conveying a valuable coal lease in exchange for employment could provide adequate consideration); *Toni v. Kingan & Co.,* 214 Ind. 611, 15 N.E.2d 80 (Ind. 1938) (holding that releasing the employer from liability on a personal injury claim would constitute adequate independent consideration.)

No. 3:07cv017, 2008 WL 141574, at *8 (N.D. Ind. Jan. 11, 2008). But simply moving locations to take another job does not constitute adequate independent consideration. *Ohio Table Pad. Co.*, 424 N.E.2d at 146 ("[M]oving one's household to a new location . . . will not constitute independent consideration to support a contract of permanent employment so as to impose the requirement of good cause upon the right to terminate the employee . . . The relinquishment by the employee of an existing job, business, or profession, without more, will not impose such requirement."). Additionally, an employee simply continuing his or her employment will not provide adequate independent consideration. *McCalment v. Eli Lilly & Co*, 860 N.E.2d 884, 889 (Ind. Ct. App. 2007).

It is not entirely clear from plaintiff's response brief what adequate independent consideration he gave his employer. All plaintiff states is "[Mart's reports of illegal or unethical conduct] not only placed Mart squarely under the protective umbrella of the Berkshire Code, they also brought into play [the adequate independent consideration exception to the at-will doctrine]." (DE # 93 at 4-5.) Plaintiff then proceeds to give a

13

general description of the adequate independent consideration exception without explaining how it applies to his case. (*Id.* at 5.) Because plaintiff does not clearly put forth his argument as to why the adequate independent consideration exception applies, the court assumes from what little it has been given that plaintiff's argument is that the reports of alleged unethical and illegal behavior that Mart provided were enough of a detriment to him and a benefit to his employer that they changed his employment status from at-will to for cause.

The court finds that Mart did not provide adequate independent consideration by reporting the alleged violations so as to transform his employment status to for cause. The few Indiana cases that have found adequate independent consideration focused on the employee giving up a job with permanent job security or some other valuable asset. *See Speckman v. City of Indianapolis*, 540 N.E.2d 1189, 1192 (Ind. 1989) (release of wrongful discharge claims against employer found to be adequate independent consideration); *Romack*, 511 N.E.2d at 1025-26 (adopting and incorporating *Romack v. Pub. Serv. Co.*, 499 N.E.2d 768, 776-79 (Ind. Ct. App. 1986) (Conover, J., dissenting)) (adequate independent consideration found where employee left job with permanent employment after receiving assurances that new job would have similar permanent employment); *Toni*, 15 N.E.2d at 83-86 (adequate independent consideration found where employee released employer from injury liability claim); *Ohio Table Pad Co.*, 424 N.E.2d at 146 (suggesting that employee giving up competing business to take job could constitute adequate independent consideration); *Mt. Pleasant Coal*, 151 N.E. at

11 (conveying coal lease in exchange for employment found to be adequate independent consideration). What Mart alleges as adequate independent consideration here, the reporting of alleged violations, simply is not the same type of consideration that Indiana courts have found sufficient to meet the adequate independent consideration exception. Mart neither gave up permanent employment on the promise of similar permanent employment nor gave up some other type of valuable asset.

The language of the Code itself lends plaintiff no support. The court may not usually consider matters outside of the pleadings on a motion to dismiss. *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 ( 7th Cir. 2002). However, the Seventh Circuit has allowed district courts to analyze documents a defendant attaches to its motion to dismiss if the documents are referred to in plaintiff's complaint and are central to plaintiff's claim. *Id.* (citing *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). Here, the Code is referred to in plaintiff's amended complaint on multiple pages. (DE # 5 at 2, 3, 6, 9, 11, 13, 14, 15, 19.) Additionally, as the court has allowed plaintiff's adequate independent consideration claim to proceed to substantive legal analysis, the Code is also central to that claim. Plaintiff's response brief states: "[The reports of alleged illegal behavior] not only placed Mart squarely under the protective umbrella of the Berkshire Code, they also brought into play a [the adequate independent consideration exception]." (DE # 93 at 4-5.) He goes on to state: "The Berkshire Code's anti-retaliation promise was a job security provision that limited Forest River's right to terminate at-will employees. This anti-retaliation provision

became part of the agreement between the parties upon the formation of a unilateral contract between Berkshire, Forest River, and Mart." (*Id.* at 5.) The Code is clearly central to plaintiff's adequate independent consideration and unilateral contract claims (discussed *infra*). Additionally, both plaintiff (DE # 93-1 at 12) and the FR defendants (brief in support of motion to dismiss for lack of jurisdiction) (DE # 31-3 at 7) have attached the Code to various briefs. Therefore, the court concludes it is proper to analyze the language of the Code in relation to plaintiff's adequate independent consideration claim.

Although not stated expressly in his response brief,[7] the language Mart appears to rely on from the Code states:

> The Company's directors, CEO, senior financial officers and chief legal officer shall promptly report any known or suspected violations of this Code to the Chairman of the Company's Audit Committee. All other Covered Parties should talk to supervisors, managers or other appropriate personnel about known or suspected illegal or unethical behavior.

(DE # 93-1 at 15.) Mart did not provide adequate independent consideration to his employer by following the procedures described in the Code, thus changing his status from an at-will employee to a for cause employee. These actions are more in line with "continued services" than "adequate independent consideration." As noted above, an

---

[7] As mentioned earlier, this part of Mart's response brief is not entirely clear as to his theory of adequate independent consideration. The court assumes his theory is that by reporting these alleged violations, Mart gave adequate independent consideration to his employer, thus changing his employment status to for cause.

employee simply continuing employment is not sufficient for the adequate independent consideration exception. *McCalment*, 860 N.E.2d at 889.

There would be bizarre logical consequences if the court accepted plaintiff's position on this matter. If an employee could provide adequate independent consideration by reporting violations as set out in the Code, it seems that an employee could provide adequate independent consideration by reporting a potential conflict of interest or refraining from participating in insider trading. (DE #93-1 at 12-14.) The court does not believe an Indiana appellate court would find any of these scenarios to constitute adequate independent consideration. The court cannot find, and plaintiff does not cite, an Indiana appellate decision that would support plaintiff's argument that an Indiana appellate court would recognize an exception to the at-will doctrine in this case. Additionally, the court is mindful of Indiana's policy favoring at-will employment, and the reluctance of Indiana appellate courts to cut back the protections of the at-will doctrine. As the district court in *Woodall v. AES Corp.* aptly stated, "we must heed Indiana appellate courts' frequent statements that any further exceptions to employment at will must come from Indiana's General Assembly and not its appellate courts (and certainly not a federal court sitting in its district)." No. IP–02–575–C–B/S, 2002 WL 1461718, at *3-4 (S.D. Ind. July 5, 2002) (citing *Morgan Drive Away, Inc. v. Brant,* 489 N.E.2d 933, 934 (Ind. 1986)).

Plaintiff's next argument that he was not an at-will employee is based on a unilateral contract theory. Plaintiff's theory is that defendants Berkshire and Forest

River made an offer via the Code by promising that no retaliatory action would be taken against anyone reporting illegal behavior, and plaintiff accepted that offer by reporting the alleged wrongdoing. (DE # 93 at 5-6.) Plaintiff alleges that this unilateral contract "limited Forest River's rights as an at-will employer" and created a separate contract that both Forest River and Berkshire breached. (*Id.* at 5.)

Indiana courts have been extremely reluctant to allow employee handbooks[8] to form the basis of a unilateral contract. *See Orr,* 689 N.E.2d at 719-22; *Hayes v. Trs. of Ind. Univ.*, 902 N.E.2d 303, 312-13 (Ind. Ct. App. 2009); *McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 889 (Ind. Ct. App. 2007). The Indiana Court of Appeals has even gone as far as stating that under Indiana law, employee handbooks do not create "unilateral contracts of employment."[9] *McCalment*, 860 N.E.2d at 889; *see also City of Indianapolis v. Byrns*, 745 N.E.2d 312, 317 n.3 (Ind. Ct. App. 2001). The Indiana courts' refusal to recognize employee handbooks as a basis for unilateral contracts appears to stem from

---

[8]     Although the Code is not labeled an employee handbook, plaintiff is arguing, similar to the employees in the employee handbook cases, that this document, a non-employment agreement document that sets out general guidelines for the employment relationship, has an impact on the employer-employee relationship. Accordingly, the court finds that the Code is legally analogous to an employee handbook for the purposes of this opinion.

[9]     The Seventh Circuit has cast doubt on these broad statements by the Indiana Court of Appeals, noting a "line of Indiana cases that has enforced the terms of employee handbooks running in favor of employers on the issue of employees' entitlement to vacation pay upon termination." *Peters v. Gilead Scis., Inc.*, 533 F.3d 594, 599 n.8 (7th Cir. 2008) (citing *Damon Corp. v. Estes,* 750 N.E.2d 891, 893 (Ind. Ct. App. 2001); *Ind. Heart Assocs., P.C. v. Bahamonde,* 714 N.E.2d 309, 312 (Ind. Ct. App. 1999); *Die & Mold, Inc. v. Western,* 448 N.E.2d 44, 48 (Ind. Ct. App. 1983)). However, those cases dealt with vacation pay, not the issue of at-will employment.

a desire to keep the at-will employment doctrine in tact. *Orr,* 689 N.E.2d at 722 ("We decline plaintiffs' invitation to construe employee handbooks as unilateral contracts and to adopt a broad new exception to the at-will doctrine for such handbooks.").

Although the Indiana Supreme Court has not expressly addressed whether a unilateral employment contract requires adequate independent consideration or whether an employee handbook can "ever constitute a unilateral contract serving to modify [an] otherwise at-will employment relationship[,]" *Orr*, 689 N.E.2d at 719-20, there have been many Indiana courts and federal courts applying Indiana law that have required either a definite term or adequate independent consideration to find an employee handbook constitutes a contract. *See St. John v. Elletsville*, 46 F. Supp. 2d 834, 843-44 (S.D. Ind. 1999) ("Since it is undisputed that the employment manual at issue neither contained a definite term of employment nor was supported by adequate independent consideration, we *GRANT* defendants' motion for summary judgment on the state law breach of contract claim.") (emphasis in original); *Hostettler v. Pioneer Hi-Bred Int'l., Inc.*, 624 F. Supp. 169, 172 (S.D. Ind. 1985) ("[I]n the absence of a promise for employment for a definite period of time, the existence or non-existence of any provision of the employee handbook is immaterial."); *Wior*, 669 N.E.2d at 178 n.6 ("We also affirm the trial court regarding its conclusion that [defendant's] Employee Handbook does not create a claim since [plaintiff] provided no additional independent consideration."); *Mead Johnson and Co. v. Oppenheimer*, 458 N.E.2d 668, 671 (Ind. Ct. App.

1984) ("Employee handbooks are immaterial without an enforceable agreement between the employer and employee of employment for a definite duration.").

The FR defendants direct the court to *Campbell v. Eli Lilly & Co.*, in which the plaintiff argued that the provisions of an employee handbook constituted a covenant that became part of his conditions of employment. 413 N.E.2d 1054, 1062-63 (Ind. Ct. App. 1980). The court affirmed the trial court in rejecting this claim and quoted:

> Even assuming, arguendo, that the handbook relied upon by appellant constituted a part of the contract, *in the absence of a promise on the part of the employer that the employment should continue for a period of time that is either definite or capable of determination, the employment relationship is terminable at the will of the employer.* There being no binding promise on the part of the employee that he would continue in the employment, it must also be regarded as terminable at his discretion as well. For want of mutuality of obligation or consideration, such a contract would be unenforcible (sic) in respect of that which remains executory.

*Id.* at 1062 (quoting *Shaw v. S.S. Kresge Co.*, 328 N.E.2d 775, 779 (Ind. Ct. App. 1975)) (internal citations omitted and emphasis added).

Given the Indiana Supreme Court's refusal in *Orr* to adopt a "broad new exception to the at-will doctrine,"[10] the court does not believe an Indiana appellate court would be willing to agree with plaintiff that the Code limited Forest River's rights as an at will employer. *Orr*, 689 N.E.2d at 722. Here, the Code does not contain a "promise on

_____

[10]    The Indiana Supreme Court also stated: "[I]n Indiana, the presumption of at-will employment is strong, and this Court is disinclined to adopt broad and ill-defined exceptions to the employment-at-will doctrine." *Orr*, 689 N.E.2d at 717-18 (citing *Wior*, 669 N.E.2d at 177 & n.5, 178).

the part of the employer that the employment should continue for a period of time that is either definite or capable of determination." *Campbell*, 413 N.E.2d at 1062. Plaintiff does not argue that there is a definite term in the Code. However, it is plaintiff's contention that by reporting the alleged wrong-doing, he provided consideration for what became a unilateral contract. (*Id.* at 6.) But as discussed above, these actions do not constitute adequate independent consideration under that exception to the at-will doctrine.

Plaintiff is asking the court to chip away at the protections provided by the at-will employment doctrine, but has provided no case law to support his argument that the Code created a unilateral contract limiting defendant Forest River's rights as an at-will employer. The court's own research was unable to unearth Indiana case law that would lead the court to believe that allowing plaintiff's claim to proceed would be anything other than a novel exception to Indiana's at-will employment doctrine. Because the Indiana Supreme Court has not yet recognized that an employee handbook can constitute a unilateral contract, the court is unwilling to make any such exception.

Plaintiff also argues that the Code created a "separate contract that Forest River and Berkshire both breached." (DE # 93 at 5.) Unfortunately for the plaintiff, he does not thoroughly develop this argument. Plaintiff essentially explains what a unilateral contract is and then proceeds to cite the *"Carbolic Smoke Ball"*[11] case in arguing that a

---

[11]    In the *"Carbolic Smoke Ball"* case, a staple in first year law school classes, the defendant produced a carbolic smoke ball to fight influenza, and in an advertisement, promised £100 to anyone who contracted influenza or a cold after taking

unilateral contract theory is not a novel theory.[12] (*Id.* at 5-6.) But what plaintiff fails to do

is present any Indiana case law that supports his position. The court will not develop

legal arguments for plaintiff. "It is not the obligation of this court to research and

construct the legal arguments open to parties, especially when they are represented by

counsel." *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986); *see also  U.S. v. Dunkel*, 927

F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in

briefs.").

One case from the Southern District of Indiana, *Ward v. Independent Order of*

*Foresters*, which neither party cites, is on point. No. 1:04-CV-00676-SEBVSS, 2006 WL

571874 (S.D. Ind. Mar. 7, 2006). In *Ward*, the plaintiff argued that the defendant, his ex-

employer, breached its express covenant of good faith and fair dealing when it

terminated the plaintiff after reporting violations of the company's Code of Ethics. *Id.* at

7-8 & n.6. The Code of Ethics stated: "Persons who in good faith report misconduct or

_____

the carbolic smoke balls three times a day for two weeks. *Carhill v. Carbolic Smoke Ball Co.*, (1893) 1 Q.B. 256, 256-257. The plaintiff, after seeing the advertisement, took the smoke balls as directed for well over two weeks, but still contracted influenza. *Id.* The court found the advertisement constituted an offer that the plaintiff accepted by following the directions set out in the advertisement. *Id.* at 261-65.

[12]        Plaintiff also quotes *Ryan v. J. C. Penney Co., Inc.*, where the Seventh Circuit stated: "Indiana indeed recognizes that an employment contract may be enforced as a valid unilateral contract although there is no mutuality of obligation." 627 F.2d 836, 838 (7th Cir. 1980) (citing *Seco Chemicals, Inc. v. Stewart*, 349 N.E.2d 733, 738 (Ind. Ct. App. 1976)). However, in the very next sentence, the Seventh Circuit stated: "Nevertheless, even for a unilateral employment contract, there must be a definite term or separate executed consideration." *Id.* As noted above, neither of these exist in the case at hand.

other breaches under the Code will be protected from all forms of reprisal or retaliatory actions." *Id*. at 8 n.6. The court dismissed the express covenant of good faith and fair dealing claim, but it also noted:

> Count 2 cannot be fairly read to assert that the Code of Ethics' promise of whistleblower protection constituted an offer of a unilateral contract by [defendant] which [plaintiff] accepted by his performance of reporting Code violations. Even if it can be so read, the Indiana Supreme Court has expressly refused to recognize "a broad new exception to the at-will doctrine for employee handbooks." *Orr,* 689 N.E.2d at 719.

*Id.* at *9 n.8. The facts of *Ward* are extremely similar to the case at hand. Although only persuasive, the court agrees with the court in *Ward*, and does not believe that an Indiana appellate court would find a separate contract here.

Finally, plaintiff argues "[t]he lack of a stated term of employment in Mart's employment contract did not mean that Mart and Forest River could not add a job security clause . . . ." (DE # 93 at 4.) Plaintiff quotes the Indiana Supreme Court in *Orr*: "If the parties choose to include a clear job security provision in an employment contract, the presumption that the employment is at-will may be rebutted." *Orr*, 689 N.E.2d at 717. The court will construe plaintiff's statement as an argument that the anti-retaliation section of the Code constituted an enforceable job security provision. Although this is the extent of plaintiff's argument on this matter, the court chooses to address it, and finds that the strong presumption of at-will employment has not been rebutted. *Id.* at 717-18 ("In Indiana, the presumption of at-will employment is strong . . . .").

Indiana case law does not support plaintiff's argument on this point. "[A]s a rule of contract construction, the employment at-will doctrine does not prevent job security provisions from becoming part of an at-will employment contract, so long as the parties intended them to be part of the employment contract and *so long as the contract is otherwise enforceable.*" *Bentz Metal Prods. Co., Inc. v. Stephans,* 657 N.E.2d 1245, 1249 (Ind. Ct. App. 1995) (emphasis added) (citing *Orr v. Westminster Vill. N., Inc.*, 651 N.E.2d 795, 798 (Ind. Ct. App. 1995), *rev'd on other grounds*, 689 N.E.2d 712 (Ind. 1997)). As discussed above, the Code did not create an enforceable contract.

Additionally, the facts of the case at hand are very different from the sole Indiana appellate decision the court could find enforcing a job security provision. *Eck & Assocs., Inc. v. Alusuisse Flexible Packaging, Inc.*, 700 N.E.2d 1163 (Ind. Ct. App. 1998). In *Eck*, the plaintiff argued that his contract with his employer contained a clear job security provision. *Id.* at 1166. The court agreed, noting that the plaintiff specifically negotiated replacing language in the employment contract that said he could be discharged with sixty days notice "for any reason, with or without cause" with "[t]his agreement may be terminated by either party *for just cause,* upon sixty (60) days written notice." *Id.* at 1167-69 (emphasis in original). The facts of *Eck* are remarkably different from the facts of this case. Plaintiff did not negotiate with Forest River to put language in his employment agreement that would have changed his employment status to for cause. Therefore, Indiana's presumption of at-will employment has not been rebutted.

C.      Breach of Contract

In plaintiff's amended complaint, plaintiff alleges a breach of contract[13] claim

based on the Agreement from October 31, 2007. (DE # 5 at 15.) The FR defendants

responded in their brief in support of their motion to dismiss by arguing this agreement

could not constitute an employment contract under Indiana law because the four

elements set out in *Majd Pour v. Basic American Medical, Inc.*, have not been met. 512

N.E.2d 435, 439 (Ind. Ct. App. 1987); (DE # 30 at 4-5). The four elements of an

employment contract as set out in *Majd Pour* are "1) it must state the place of

employment; 2) it must state the period of employment; 3) it must state the nature of the

services the employee is to render; and 4) it must state the compensation the employee

was to receive." *Majd Pour*, 512 N.E.2d at 439. The FR defendants argue the period of

employment element was missing from the written agreement. (DE # 30 at 5.) In his

_____

[13]      Plaintiff's breach of contract claim asserts that even assuming he was an
at-will employee, because the contract was terminable but not yet terminated, the
provisions of the agreement were breached when defendants failed to make plaintiff
CEO and failed to pay him his full compensation. (DE # 5 at 15; DE # 93 at 11-13.) This
argument is based on the Indiana Supreme Court case *Bochnowski v. Peoples Federal
Savings & Loan Ass'n*. 571 N.E.2d 282 (Ind. 1991). In *Bochnowski*, the lower court had held
that an at-will employee could not maintain an action for the tort of intentional
interference with a contract. *Id.* at 284. The Indiana Supreme Court reversed, holding
that "a claim for tortious interference with an employment relationship can be
maintained upon a contract terminable at will." *Id.* at 285. Plaintiff argues that
*Bochnowski* stands for the proposition that even though plaintiff was an at-will
employee, Forest River still had to follow the terms of the Agreement prior to plaintiff's
termination. (DE # 93 at 11-13.) The FR defendants argue that *Bochnowski* is not
applicable because plaintiff has conceded the Agreement is not a binding contract, and
*Bochnowski* does not apply to the facts of this case. (DE # 100 at 10.) However, even if the
FR defendants are correct that *Bochnowski* does not control here, the principle plaintiff
asserts *Bochnowski* stands for is still applicable.

response brief, plaintiff did not respond to the argument that the Agreement failed to meet the four elements of *Majd Pour*, and the FR defendants argue that plaintiff has therefore waived his breach of contract claim. (DE # 100 at 2-3.)

The court agrees that plaintiff may no longer argue that the Agreement meets the four elements set out in *Majd Pour*. The Seventh Circuit's decision in *Bonte v. U.S. Bank, N.A.*, is instructive on this issue. In *Bonte*, the plaintiffs filed a claim against the defendant under the Truth in Lending Act seeking mortgage rescission. *Bonte*, 624 F.3d at 462-63. The plaintiffs failed to respond to the defendant's argument in a motion to dismiss that the misstated charges were "material." *Id.* The district court concluded this constituted waiver and dismissed the plaintiffs' complaint. *Id.* The plaintiffs again failed to respond to the defendant's argument on appeal, and the appellate court affirmed the district court stating: "Failure to respond to an argument . . . results in waiver." *Id.* at 466. However, the court did not find that the plaintiffs had waived their entire claim, rather, "[plaintiffs'] failure to respond to U.S. Bank's arguments leads us also to conclude that they have waived any argument that the allegedly erroneous TILA disclosures are in fact 'material.'" *Id.* The same analysis applies here. Plaintiff has waived any argument that the Agreement constituted an employment contract under the four-element test set out in *Majd Pour*. But that does not mean that plaintiff has waived his entire breach of contract claim.[14]

---

[14] In their motion to dismiss, the FR defendants also argued that the Indiana Statute of Frauds prevented plaintiff from using parol evidence to establish the period of employment element of *Majd Pour*. (DE # 30 at 5-7.) Plaintiff did not respond to this

Under Indiana law, both employment for a definite term and employment at-will are considered contractual relationships. *Whinery v. Roberson*, 819 N.E.2d 465, 472 (Ind. Ct. App. 2004). Courts have used the four-element test from *Majd Pour* discussed above when addressing employment contracts involving definite terms of employment. *See, e.g.*, *Jones v. Gen. Elec. Co.*, 87 F.3d 209, 213 (7th Cir. 1996); *Ritter v. Stanton*, 745 N.E.2d 828, 840 (Ind. Ct. App. 2001).

In *Majd Pour*, the plaintiff brought an action for breach of contract alleging that the defendant terminated him before the expiration of the contract. *Majd Pour,* 512 N.E.2d at 437. The Indiana Court of Appeals used the four-element test to determine if the alleged contract constituted a valid and enforceable employment contract. *Id.* at 439. Although the court in *Majd Pour* did not explicitly discuss the type of contract that would have been created if the four elements were met, because the breach of contract claim was for termination prior to the expiration of the contract, it appears that the court was analyzing a contract for a definite term.

Similarly, in *Firestone v. Standard Management Corp*, a district court, sitting in the Southern District of Indiana, used the four-element test in analyzing whether the alleged contract created an at-will relationship or a relationship that was for a definite term requiring defendant to pay the plaintiff his salary beyond his discharge date, a

argument in his response brief. In their reply brief, defendants argue that because plaintiff makes no response to this argument, he has conceded its validity. (DE # 100 at 3.) The court agrees that the plaintiff cannot now try to supply the period of employment through the use of parol evidence. *Bonte*, 624 F.3d 466.

bonus plaintiff was to receive at the end of his first year of employment, and a severance payment. No. 1:04-CV-1223-DFH-TAB, 2005 WL 1606955, at *3-6 (S.D. Ind. July 05, 2005). Finally, in *Butts v. Oce-USA, Inc.*, the district court sitting in the Southern District of Indiana used the four-element test to determine whether the plaintiff was an at-will employee or an employee for a definite term who could only be fired for cause. 9 F. Supp. 2d 1007, 1011 (S.D. Ind. 1998).

In cases where a definite term was not part of the employment relationship, Indiana courts have used the traditional three-part test for determining the existence of an employment contract: "The elements of an employment contract are established by '[Employer's] (1) offer to pay (2) consideration for the Employee's services and (3) the Employee's acceptance through performance of services.'" *Williams, Riverside Cmty. Corrs. Corp.*, 846 N.E.2d 738, 745 (Ind. Ct. App. 2006) (quoting *Whinery*, 819 N.E.2d at 473). *Williams*, the case that is most factually similar to the case at hand, utilized this test. In *Williams*, the plaintiff brought a breach of contract claim against her former employer alleging improper reduction of her hourly wage rate for her last pay period. *See id.* at 745. The plaintiff argued that her hourly wage, $9.25 per hour, was part of her at-will employment contract, and the court agreed, analyzing the claim under the three factors mentioned above. *Id.* at 744-45 ("[Employer's] (1) offer to pay (2) consideration for the Employee's services and (3) the Employee's acceptance through performance of services."). The defendant argued the plaintiff had agreed to the reduction of her hourly pay rate, but the court disagreed and ordered the trial court to enter summary

28

judgment for the plaintiff. *Id.* at 745-56. Nothing in *Williams* indicates that the hourly wage was set out in a document that would meet the *Majd Pour* elements, but the court still held that a term of the employment agreement, the original wage rate, was enforceable as between an employer and an at-will employee.

In sum, the four-element *Majd Pour* test is used by Indiana courts to find a binding and enforceable employment contract for a definite term (creating a relationship where an employee can only be fired for cause), and the three factor test discussed in *Williams* is used to determine when the contractual relationship between employer and employee is at-will. *See also Firestone*, 2005 WL 1606955, at *3-6 (explaining distinction).

These principles stand for the proposition that the fact that an employment contract is not for a definite term does not mean that all of its terms are unenforceable. Rather, the terms of an at-will employment relationship are enforceable as long as the at-will employment relationship continues. As a district court sitting in Massachusetts[15] aptly summarized:

> A contract-at-will . . . may contain binding terms that are effective during the life of the contract. . . . Indeed, so long as an employment relationship exists, employer and employee may have strong reasons to define its terms. . . . While the agreement between them did not bind the defendant to employ plaintiff for any specified length of time, its terms defined the parties' rights so long as plaintiff remained on the job.

---

[15]     When there is an absence of authority, relevant cases from other jurisdictions may be consulted. *Amerisure, Inc. v. Wurster Const. Co., Inc.*, 818 N.E.2d 998, 1004 (Ind. Ct. App. 2004), *abrogated on other grounds by Sheehan Constr. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160 (Ind. 2010).

*Sargent v. Tenaska*, 914 F. Supp. 722, 726 (D. Mass. 1996); *see also* 19 Richard A. Lord,

Williston on Contracts § 54:9 (4th ed. 2011) ("[T]he fact that an express contract is for an

unspecified length of time does not necessarily render it unenforceable, at least to the

extent that the contract continues to define the rights of the parties so long as the

employee remains on the job.").

Because this is a motion to dismiss, the court must assume the truth of all

allegations set out in plaintiff's amended complaint. *See Hammond v. Kunard*, 148 F.3d

692, 695 (7th Cir. 1998). Plaintiff contends that the Agreement (October 31, 2007) made

him CEO effective immediately, with a salary of $175,000 a year and an annual bonus of

10% of defendant Forest River's profits over $90 million. (DE # 5 at 7; DE # 5-1 at 1.)

Plaintiff also alleges that defendants breached the agreement by failing to make him

CEO and failing to pay him his full compensation.[16] (*Id.* at 15.)

The court finds that an Indiana court would find that the parties entered into an

at-will employment relationship, not an agreement for a definite term of employment,

and therefore would enforce the agreement for as long as the relationship existed. *See*

*Williams,* 846 N.E.2d at 744-46; *Firestone*, 2005 WL 1606955, at *3-6; *Sargent*, 914 F. Supp.

---

[16]     To the extent that plaintiff's contentions in his amended complaint that plaintiff "was to be named the CEO of Forest River, would act as CEO of Forest River" conflict with the employment agreement that indicated Mart was hired as CEO effective October 31, 2007, the employment agreement would trump the amended complaint. *See N. Ind. Gun & Outdoor Shows Inc. v. City of South Bend*, 163 F.3d 449, 454-55 (7th Cir. 1998) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

at 726. Further, the FR defendants did not argue that plaintiff's complaint fails to adequately allege the well-established elements of an at-will contract: offer, acceptance, and consideration. Therefore, the court finds plaintiff has alleged sufficient facts to survive a motion to dismiss for failure to state a claim on which relief can be granted on the breach of contract claim for failing to make plaintiff CEO and for failing to pay plaintiff's full compensation to the extent that compensation was earned prior to plaintiff's termination.[17]

### D.    Negligent Misrepresentation

The FR defendants contend that plaintiff has failed to state a cognizable claim for negligent misrepresentation. (DE # 30 at 8, DE # 100 at 3-5.) The tort of negligent misrepresentation is recognized in Indiana in the limited circumstance of the employer-employee relationship.[18] *See Darst v. Ill. Farmers Ins. Co.*, 716 N.E.2d 579, 583-84 (Ind. Ct.

---

[17]    There is still the possibility that plaintiff can rebut the at-will presumption with the promissory estoppel exception to the at-will doctrine. (DE # 100 at 5 n.2.)

[18]    In its motion to dismiss, Berkshire notes that negligent misrepresentation has also been recognized in the context of professionals giving opinions. (DE # 32-1 at 23.) The Indiana Supreme Court has weighed in on negligent misrepresentation in the professional context: "A professional may owe a duty to a third party with whom the professional has no contractual relationship, but the professional must have actual knowledge that such third person will rely on his professional opinion." *U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 747 (Ind. 2010) (citing *Thomas v. Lewis Eng'g, Inc.,* 848 N.E.2d 758, 760 (Ind. Ct. App. 2006)). The Indiana Court of Appeals has noted that "[the court acknowledges] Indiana decisions that have held brokers, attorneys, abstractors, and surveyors liable for negligent misrepresentation, but [the defendant has cited no authority] indicating liability is limited to those professions." *Jeffrey v. Methodist Hospitals*, 956 N.E.2d 151, 156 n.7 (Ind. Ct. App. 2011). Plaintiff has not argued that this line of cases applies to the case at hand.

App. 1999). The seminal case on negligent misrepresentation in Indiana is *Eby v. York-Division, Borg-Warner*. 455 N.E.2d 623 (Ind. Ct. App. 1983). In that case, the Indiana Court of Appeals set out the elements of the tort of negligent misrepresentation:

> The primary elements of the tort of negligent misrepresentation are found in RESTATEMENT (SECOND) OF TORTS § 552 (1977), which limits responsibility to the following:
>
> "(1) *One who, in the course of his* business, profession, or *employment,* or in any other transaction in which he has a pecuniary interest, *supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss* caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."

*Id.* at 628-29 (emphasis in original).

In *Eby*, the plaintiffs brought a claim for negligent misrepresentation after the defendant's employee told one of the plaintiffs there was a job waiting for him in another city. *Id.* at 625, 628-29. After moving to take the job, the plaintiff reported to work and found out that the employee who had offered him the job was no longer with

the company, and the job was no longer available. *Id.* at 625. The court recognized the

tort for the plaintiffs' action and ruled that summary judgment should not have been

entered for the defendant. *Id* at 629-30.

Since the *Eby* decision, as the FR defendants point out, the Indiana Court of

Appeals has limited the application of *Eby* to its own facts. For example, in *Darst v.*

*Illinois Farmers Insurance Co.*, the Indiana Court of Appeals stated: "[W]e decline to

extend the tort's application beyond the specific facts of *Eby.*" *Darst*, 716 N.E.2d at 584.

Similarly, in *Pugh's IGA, Inc. v. Super Food Services, Inc.*, the Indiana Court of Appeals

stated: "*Eby* is limited to its own facts . . . ." 531 N.E.2d 1194, 1199 n.1 (Ind. Ct. App.

1988). However, neither of these cases dealt with the employer-employee relationship.

*See Darst*, 716 N.E.2d at 580-81 (relationship between insurer and insured); *Pugh's IGA,*

*Inc.,* 531 N.E.2d at 1196 (business relationship with one party providing market study to

other party).

Other courts have allowed plaintiffs in the employment context to bring claims

for negligent misrepresentation. For example, in *Trytko v. Hubbell, Inc.*, the plaintiff

brought a claim for negligent misrepresentation against his former employer alleging

negligent advice in regard to exercising certain stock options. 28 F.3d 715, 718-19 (7th

Cir. 1994). The Seventh Circuit went into a thorough analysis of Indiana Courts'

treatment of the tort of negligent misrepresentation, and concluded that the facts in

*Trytko* were similar enough to *Eby* to maintain a claim for negligent misrepresentation.

*Id.* at 720-21. ("As in *Eby,* the issue in this case is simply whether an employer, through

its agent, breached a duty to protect its employee against the employer's own negligence by making false representations upon which the employee relied to his detriment.").

Similarly, in *Abdulrahim v. Gene B. Glick Co.*, the plaintiff brought an action for negligent misrepresentation against his former employer. 612 F. Supp. 256, 258 (N.D. Ind. 1985). The plaintiff had worked for the defendant for several months. *Id.* at 258-59. After his employment had ended, the plaintiff applied for two other open positions, which he did not get. *Id.* at 259. After that, he spoke with one of the defendant's executive managers who told the plaintiff she would make sure he was rehired the following summer. *Id.* He was not rehired, and he brought suit for negligent misrepresentation. *Id.* On appeal, the defendant argued that negligent misrepresentation was not a separate cause of action in Indiana. *Id.* at 263. The court disagreed, citing to *Eby* and concluding that the plaintiff's negligent misrepresentation claim could survive a motion to dismiss. *Id.* at 263-64.

Here, similar to the plaintiffs in *Eby*, *Trytko*, and *Abdulrahim*, plaintiff has alleged he relied on representations by his employer's employee that plaintiff had a specific job with defendant Forest River (plaintiff believed he was made CEO on October 31, 2007, and was sharing the position with defendant Liegl until the end of 2008), and he moved his family to Indiana in reliance on this representation. (DE # 5 at 7, 12.) The court finds that an Indiana appellate court would allow a claim for negligent misrepresentation to

survive a motion to dismiss under these circumstances. The facts of this case are similar enough to the facts of *Eby*, *Trytko*, and *Abdulrahim*, to warrant this conclusion.

Plaintiff also alleges that defendants' violation of the Code by firing him and therefore retaliating against him for reporting violations of the Code constitutes negligent misrepresentation. (*See id.* at 19-20, DE # 93 at 16-17.) The court finds that this allegation is not factually similar enough to *Eby* to allow the claim to survive a motion to dismiss. Neither *Eby* nor any of the cases applying *Eby* lead the court to believe that an Indiana appellate court would find an actionable negligent misrepresentation claim based on alleged misrepresentations contained in a corporation's code of ethics.

The FR defendants also contend that plaintiff's negligent misrepresentation claim must be dismissed because the alleged misrepresentations dealt with future conduct, and to be actionable, misrepresentations must deal with past or presently existing facts. (DE # 30 at 10-11.) The FR defendants point to the language of plaintiff's amended complaint in which plaintiff alleges that he was going to be named CEO in the future. (*Id.* at 11-12.) Even assuming the FR defendants' legal argument here is correct, plaintiff, in the negligent misrepresentation portion of his amended complaint, incorporated all preceding paragraphs, including the paragraphs that alleged Mart was made CEO on October 31, 2007, effective immediately, and that Mart believed he was sharing the role of CEO with Liegl until the end of 2008. (DE # 5 at 7, 12, 19.) With these allegations, plaintiff sufficiently alleges a presently existing fact.

Finally, the FR defendants argue that plaintiff could not have justifiably relied on defendants' representations because plaintiff was an at-will employee. (DE # 30 at 12-13.) However, in his response brief, plaintiff argues that he was not an at-will employee because of the promissory estoppel exception to the at-will doctrine set out in *Orr*. *See Orr*, 689 N.E.2d at 717-18; (DE # 93 at 7-9). The FR defendants concede that plaintiff can survive the motion to dismiss on a claim for promissory estoppel. (DE # 100 at 5 n.2.) Therefore, the FR defendants cannot succeed on their justifiable reliance argument at this stage of the litigation.

## II. Defendant Berkshire's Motion to Dismiss Plaintiff's Negligent Misrepresentation Claim[19]

Defendant Berkshire argues that the tort of negligent misrepresentation does not apply here because Indiana has only recognized negligent misrepresentation in very limited circumstances. (DE # 32-1 at 23.)[20] In its motion to dismiss, Berkshire argues that plaintiff has "failed to allege facts sufficient to show that Berkshire made any false representations to Plaintiff . . . ." (*Id.* at 24.) As stated in *Eby*, the tort of negligent misrepresentation, as set out by the Restatement, includes:

---

[19]     Berkshire moved to dismiss plaintiff's negligent misrepresentation and SOX claims in the same motion. (DE # 32.) Because Berkshire has moved to dismiss plaintiff's negligent misrepresentation claim under FED. R. CIV. P. 12(b)(6) (DE # 32), and because this part of the motion has both the same relevant facts and legal standard as the FR defendants' motion to dismiss plaintiff's state law claims, the court will analyze Berkshire's FED. R. CIV. P. 12(b)(6) argument in this part of the opinion.

[20]     For this part of Berkshire's motion, the court accepts plaintiff's factual allegations as true. *Erickson,* 551 U.S. at 93.

> *One who, in the course of his* business, profession, or *employment,* or in any other transaction in which he has a pecuniary interest, *supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss* caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Eby*, 455 N.E.2d at 628 (emphasis in original).

In his response brief, plaintiff does not address this argument, but instead directs the court to his response to the FR defendants' motion to dismiss. (DE # 94 at 25.) That document does not make clear what false representations Berkshire made to plaintiff. (DE # 93 at 13-17.) Plaintiff's only argument that Berkshire committed negligent misrepresentation is that by adopting the code it promised not to take any retaliatory action against anyone submitting reports under the Code.[21] (DE # 5 at 19-20; DE # 93 at 16.) As mentioned above, this allegation is not similar enough to *Eby* and the cases applying *Eby* to lead the court to believe that an Indiana appellate court would allow this claim to proceed. The court will not "adopt a more expansive view of the tort than that adopted to date in Indiana[,]" and plaintiff's claim must fail. *Trytko,* 28 F.3d at 721 (quoting *Indus. Dredging & Eng'g v. S. Ind. Gas & Elec. Co.*, 840 F.2d 523, 526 (7th Cir. 1988)).

---

[21] Although plaintiff does not clearly make this argument in his state law response brief (DE # 93), to the extent that plaintiff is also attempting to argue that statements made by Buffet to plaintiff form the basis for a negligent misrepresentation claim (DE # 94 at 3-4), the court finds that an Indiana appellate court would not allow this claim to proceed, as it is too dissimilar to *Eby* and the cases following *Eby. See Eby*, 455 N.E.2d at 623; *see also Trytko*, 28 F.3d at 718-19, 721; *Abdulrahim*, 612 F. Supp. at 258-59, 263-64.

**THE FR DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SOX CLAIM**

The FR defendants have moved under FED. R. CIV. P. 12(b)(1) arguing that the court lacks subject matter jurisdiction over plaintiff's Sarbanes-Oxley Act ("SOX") claim because plaintiff did not file a complaint with OSHA[22] within 90 days after the date on which the violation occurred, as required by 18 U.S.C. § 1514A(b)(2)(D).[23] (DE # 31 at 1-3.) The FR defendants' argument that the court lacks subject matter jurisdiction is based on several district court cases. *See Mann v. Gannett Co.*, No. 2:06cv888-MHT, 2007 WL 1668835, at *2-3 (M.D. Ala. June 8, 2007); *Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1373 (N.D. Ga. 2004); *Murray v. TXU Corp.*, 279 F. Supp. 2d 799, 802 (N.D. Tex. 2003); *see also Trusz v. UBS Realty Investors*, Civil No. 3:09cv268, 2010 WL 1287148, at *4 n.2 (D. Conn. Mar. 30, 2010); *Malin v. Siemens Med. Solutions Health Servs.*, 638 F. Supp. 2d 492, 496 (D. Md. 2008); *JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 705, 710 (E.D. Va. 2007) (finding § 1514A exhaustion requirements jurisdictional). Plaintiff does not address this issue in his response brief; instead he argues about the date he received notice of his termination. (DE # 91 at 6-13.) The court agrees with these district courts in

---

[22]     Under § 1514A(b), someone alleging retaliatory discharge under SOX must first file a claim with the Secretary of labor. The Secretary of Labor has delegated the authority to handle these complaints to OSHA. *Johnson v. Stein Mart, Inc.*, 440 F. App'x 795, 799 n.3 (11th Cir. 2011).

[23]     The 90-day limit was in place when plaintiff filed his claim with OSHA. As of July 22, 2010, the statute allows 180 days for the filing of a complaint. 18 U.S.C. § 1514A(b)(2)(D) (2010).

finding that a failure to exhaust administrative remedies with OSHA deprives a district court of subject matter jurisdiction over a plaintiff's SOX claim.

Plaintiff correctly asserts that the date of an unlawful employment practice is a question of fact. (DE # 91 at 7 (citing *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 640 (7th Cir. 2004)).) However, when a court's subject matter jurisdiction is at issue, "[e]ven when a jury would be required to make a decision on the merits, it is unnecessary to summon a jury to determine whether the court possesses jurisdiction[.]" *Pratt Cent. Park Ltd. P'ship v. Dames & Moore, Inc.*, 60 F.3d 350, 353 (7th Cir. 1995). The court must therefore make factual determinations to ensure it has subject matter jurisdiction. *See United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (*en banc*). The Seventh Circuit has stated:

> [I]f the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction, the movant may use affidavits and other material to support the motion. The burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction. And the court is free to weigh the evidence to determine whether jurisdiction has been established. Factual findings rendered during this process are reviewed for clear error.

*Id.* (emphasis in original) (internal citations omitted); *see also LaSalle Nat'l Trust, N.A. v. ECM Motor Co.*, 76 F.3d 140, 144 (7th Cir. 1996) ("In the 12(b)(1) case, the district court is entitled to find jurisdictional facts itself . . . ."); *Western Transp. Co. v. Couzens Warehouse & Distribs., Inc.*, 695 F.2d 1033, 1038 (7th Cir. 1982) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

The court may also look at whatever evidence has been submitted in making the jurisdictional determination. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444

(7th Cir. 2009); *Roman v. U.S. Postal Serv.* 821 F.2d 382, 385 (7th Cir. 1987) ("It is proper for the district court to look beyond the jurisdictional allegations in the complaint and to view whatever evidence has been submitted in determining whether subject matter jurisdiction exists under Rule 12(b)(1)."). In determining whether it has jurisdiction, the court does not presume the allegations in plaintiff's complaint are true.[24] *See Apex Digital*, 572 F.3d at 444 (citing *Mortensen,* 549 F.2d at 891); *Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002); *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 990 (7th Cir. 2000); *Grafon Corp. v. Hauserman*, 602 F.2d 781, 783 (7th Cir. 1979); *Couzens Warehouse & Distribs., Inc., Inc.*, 695 F.2d at 1038 (citing *Mortensen,* 549 F.2d at 891).

---

[24]     There seems to be discord in Seventh Circuit precedent as to whether the court is required to accept the allegations in plaintiff's complaint as true when reviewing a 12(b)(1) motion. As noted above, there is substantial Seventh Circuit case law that holds the court does not have to take the allegations in the complaint as true when ruling on a 12(b)(1) motion. *See e.g., Couzens Warehouse & Distribs., Inc.,* 695 F.2d at 1038 (citing *Mortensen,* 549 F.2d at 891). However, there are also a substantial number of cases that indicate the opposite is true, that the court does have to take all well-pleaded factual allegations as true. *See, e.g., Evers v. Astrue,* 536 F.3d 651, 656 (7th Cir. 2008); *St. John's United Church of Christ v. City of Chi.,* 502 F.3d 616, 625 (7th Cir. 2007); *Long v. Shorebank Dev. Corp.,* 182 F.3d 548, 554 (7th Cir. 1999). However, even in some of those cases, the Seventh Circuit has said that the court may look beyond the complaint to whatever evidence has been submitted to determine if it has jurisdiction. *Long,* 182 F.3d at 554 (quoting *Capitol Leasing Co. v. FDIC,* 999 F.2d 188, 191 (7th Cir. 1993) (per curiam)).
        Although these cases may seem to contradict each other, as long as the disputed facts concern whether the court actually has subject matter jurisdiction to hear the case, the court does not need to accept the factual allegations as true. *Int'l Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1210 (7th Cir. 1980) ("Where the defendant raises factual questions concerning jurisdiction, the court need not accept the allegations of the complaint as true; the court may look behind the complaint and view the evidence to determine whether a controversy in fact exists.").

## I. Facts[25]

Plaintiff met with Jeff Rowe, Forest River's director of human resources, on November 3, 2008. (DE # 31 at 5; DE # 91 at 6.) It isn't clear what was said at that meeting. However, it is undisputed that plaintiff and Rowe started corresponding following the November 3, 2008, meeting. The post-meeting exchanges between plaintiff and Rowe began on November 4, 2008. On November 4, plaintiff emailed Rowe, stating in part:

> As we discussed yesterday, I need to receive an email from you summarizing our conversation yesterday and clearly indicating that you are asking me not to report for work at Forest River.

(DE # 91-1 at 31.) Rowe responded with an email the same day. His email stated:

> I haven't had a chance to summarize our conversation yet, but this will confirm that there is no need to report for work at Forest River. As I stated yesterday, the decision had been made that you would no longer be employed by Forest River and it was my objective to discuss how we could, I believe the term I used was unravel the employment situation. I have also secured your personal chair, and will make arrangements to get that to you.

(*Id.* at 30.) Plaintiff responded that same day:

> I realize that you have a big assignment here and I appreciate your efforts. Thanks for at least confirming in writing that you are asking me not to report to work at Forest River.

(*Id.*) The next email in this exchange was an email sent from plaintiff to Rowe on November 13, 2008. In that email, plaintiff wrote:

---

[25] The facts relevant to defendants' motions to dismiss under FED. R. CIV. P. 12(b)(1) are significantly different from the facts relevant to defendants' FED. R. CIV. P. 12(b)(6) motions. Thus, this section of the opinion has its own set of facts.

It has now been almost two weeks since we met at the hotel conference room on the morning of November 3rd. In this meeting, we agreed that we would work toward a relatively quick resolution in your words to "unravel the employment situation[.]"

Can you please provide me with an update and/or Pete's thoughts regarding potential next steps in timing[.]

(*Id.*) Rowe contacted plaintiff next on November 19, 2008, when Rowe sent plaintiff a letter.[26] The final correspondence between plaintiff and Rowe occurred on January 8, 2009, when Rowe sent plaintiff another letter. In that letter, Rowe stated, in part:

This letter is to formally acknowledge that, as of January 1, 2009, you are no longer an employee of Forest River, Inc.

(DE # 91-1 at 33.)

## II.    Analysis

Plaintiff and the FR defendants agree that plaintiff met with Jeff Rowe, Forest River's director of human resources, on November 3, 2008. (DE # 31 at 5; DE # 91 at 6.) But the parties disagree on the significance of that meeting. Defendants contend Rowe told plaintiff his employment was terminated at that meeting. (DE # 31 at 5.) Defendants also argue that if the decision to terminate plaintiff was not clear to plaintiff on November 3, the email exchange on the between Rowe and plaintiff following day, November 4, 2008, informed plaintiff unequivocally that he had been terminated. (*See* DE # 99 at 4.) The FR defendants contend that the 90-day period began to run, at the latest, on November 4, 2008. (DE # 99 at 4.)

---

[26]     This letter (DE # 92) was filed under seal because it is a privileged and confidential settlement communication. (DE # 99 at 11 n.4.) Any references to this letter and its contents have been taken from the parties' briefs, which have not been sealed.

Plaintiff argues that he believed only Warren Buffet had the power to terminate him. (DE # 91 at 2.) He also argues that the November 4, 2008, email from Rowe was not clear about whether he had been terminated, but it instead indicated he was not welcome at the Forest River offices and that his employment situation would be "unraveled" at some future point. (*Id.*) Additionally, he argues that he did not believe that his exchanges with Rowe on November 3 and 4 were the official position of the company. (*Id.* at 10.) Mart therefore argues that the earliest trigger date for the 90-day period was November 19, 2008, the date that Rowe first sent Mart a letter. (*Id.* at 12-13.) Plaintiff filed his claim with OSHA on February 17, 2009. (DE # 5 at 17.) Therefore, if the court finds that the 90-day period to file a claim with OSHA started before November 19, 2008, plaintiff would not have filed his claim within the 90-day window, and the court would not have subject matter jurisdiction over his claim.

"Under federal discrimination statutes, the time for filing an administrative charge of employment discrimination begins running when a discrete unlawful practice takes place." *Rzepiennik v. Archstone-Smith, Inc.*, 331 F. App'x 584, 588-89 (10th Cir. 2009). "A discrete adverse action 'takes place' when a decision is made and communicated to the plaintiff, even if the effects of the action do not occur until later." *Id.* at 589 (citing *Del. State Coll. v. Ricks,* 449 U.S. 250, 258 (1990).

Under Seventh Circuit precedent, two elements must be shown in a discriminatory discharge case to establish the date of the "unlawful employment practice." *Flannery*, 354 F.3d at 637. First, "there must be a final, ultimate, non-tentative

decision to terminate the employee." *Id.* Second, "the employer must give the employee 'unequivocal' notice of its final termination decision." *Id.* At least one other district court in the Seventh Circuit has applied this two part test to § 1514A. *See Haddad v. ITT Indus., Inc.*, No. 1:05-CV-370-TLS, 2007 WL 141949, at *5-8 (N.D. Ind. Jan. 12, 2007).

As to the first element of the *Flannery* test, although Rowe did not use the term "terminate," the language he did use clearly indicated that a decision to terminate plaintiff had been made. Rowe wrote: "As I stated yesterday, the decision had been made that you would no longer be employed by Forest River . . . ." (DE # 91-1 at 30.) This is undoubtedly evidence that a final decision had been made. As to the second element, the language Rowe used was sufficient to unequivocally notify plaintiff of the decision to terminate his employment. It may have been helpful for Rowe to use the word "terminate" or "terminated" at some point during this email, but the two-part test from *Flannery* does not require any particular language. All that test requires is a final, non-tentative decision to terminate is unequivocally conveyed to the employee. *Flannery*, 354 F.3d at 637. The court finds that both elements of the *Flannery* two-part test were met on November 4, 2008. Therefore, the court lacks subject matter jurisdiction over plaintiff's SOX claim.

Plaintiff puts forth several arguments to try to avoid this result. Plaintiff first argues that a specific end date of employment must be given to constitute a notice of termination. (DE # 91 at 8.) Plaintiff cites to *Monnig v. Kennecott Corp.* in support of this argument. 603 F. Supp. 1035, 1038 (D. Conn. 1985). That case cited the Supreme Court's

decision in *Chardon v. Fernandez* in concluding that notice of termination must include a specific date of termination. 454 U.S. 6 (1981); *Monnig*, 603 F. Supp. at 1038. Although the plaintiffs in *Chardon* were given specific dates that their employment would end, nothing in the Supreme Court's opinion indicates that a specific date is a requirement for a notice of termination. 454 U.S. at 6-8. Additionally, as defendants point out, the Seventh Circuit has not held that a specific termination date must be given for a decision to be final. *Flannery*, 354 F.3d at 640-41 ("We do not mean to imply that . . . a definitive termination date must be given, or that the termination decision must be memorialized in an 'official' communication, in order for the employer's decision to be 'final.'").

Plaintiff also argues that in *Mull v. ARCO Durethene Plastics, Inc.*, the Seventh Circuit recognized the holding from *Monnig*. 784 F.2d 284, 289 n.7 (7th Cir. 1986). But the Seventh Circuit did not hold that a specific date of termination was required. The Seventh Circuit simply discussed *Monnig* in a footnote, concluding that the plaintiff's reliance on that case was "inapposite." *Id.*

Plaintiff cites *E.E.O.C. v. Westinghouse Electric Corp.* in support of his position that a specific end date is required to constitute notice of termination. 725 F.2d 211 (3d Cir. 1983) *disagreed with on other grounds, Pub. Emps. Ret. Sys. of Ohio v. Betts,* 492 U.S. 158 (1989). In that case, the EEOC brought suit under the ADEA alleging that a group of employees were denied Layoff Income and Benefits after their plant closed because of their age. *Id.* 213-15. The employer in that case counseled these employees several

weeks before the plant closed, informing them that they would not be eligible for the benefits once the plant closed. *Id.* at 215. The district court held that the limitations period began to run when the counseling sessions occurred, but the Third Circuit reversed, holding that the limitations period only began to run once the employees were laid off after the plant closed. *Id.* at 218-220. The Third Circuit distinguished the Supreme Court's decision in *Delaware State College v. Ricks*,[27] stating:

> [I]n *Ricks*, there was precise specificity as to the date of termination unlike the instant matter which is intertwined with uncertainty as to whether the employees were even informed as to when the layoff would actually take place. In contrast to *Ricks*, there is no evidence . . . indicating that the . . . employees received any notice-oral or written-of the actual date when the . . . plant would be closed. Nor can we expect these employees to have had some mystical powers of omniscience whereby they knew the precise date management was to close the plant. It is conceivable that in February 1977, those employees who were not privy to management's secrets might have been under the impression that the . . . plant would not be closed for months or even years.

---

[27]    In *Ricks*, the plaintiff, a professor at a state college, was denied tenure and filed a grievance with his employer's grievance committee. 449 U.S. 250, 252 (1980). While the grievance was pending, plaintiff was offered and accepted a one-year "terminable" contract that would end the employment relationship when it expired. *Id.* at 252-254. A few days after he had signed the contract, the grievance committee informed plaintiff that his grievance had been denied. *Id.* at 254. The plaintiff eventually brought suit under Title VII and 42 U.S.C. § 1981. *Id.* However, the district court dismissed both claims because they were untimely, concluding that the limitations periods began to run, at the latest, when the plaintiff was offered the one-year terminable contract. *Id.* at 254-55. The Third Circuit Court of Appeals reversed, holding that the limitations periods began to run when plaintiff's one-year terminal contract expired. *Id.* at 256. The Supreme Court reversed, concluding the district court was justified in using the date the plaintiff was offered the one-year contract as the date the limitations periods began to run. *Id.* at 261-262.

*Id.* at 220.

*Westinghouse* is distinguishable from the case at hand. Here, unlike in *Westinghouse*, plaintiff was told that his employment would be coming to an end. In *Westinghouse*, all that the employees were told during the counseling session was that they would not be eligible for these benefits when the plant eventually did close. *See id.* They were not laid off or put on administrative leave. Here, by contrast, plaintiff was told a decision had been made that he would no longer be employed, he was told not to report to work anymore, and he was told that arrangements would be made for him to retrieve his personal chair. (DE # 91-1 at 30.) This is a stark contract from *Westinghouse*, where the employees could have been under the impression that the plant would not "be closed for months or even years." *Westinghouse*, 725 F.2d at 220. In sum, the court finds that a termination date is not required for a final notice of termination.

Plaintiff's next argument is that any notice of termination must indicate that it is the "official position" of the employer, and Rowe's November 4 email to plaintiff failed to indicate that. (DE # 91 at 10-11.) In support of this proposition, plaintiff again cites to *Monnig*. 603 F. Supp. at 1035. In *Monnig*, the court, citing *Ricks*, held that "[f]or notice of termination to commence the ADEA filing period, it must articulate the termination as the 'official position' of the employer." *Id.* at 1037. Although the letter in *Ricks* included the phrase "official position," nothing in that case indicates that the notice of termination must include that phrase. *See Ricks*, 449 U.S. at 259-62. The Seventh Circuit has also weighed in on this issue, stating: "We do not mean to imply that *Ricks* . . .

necessarily require[s] . . . that the termination decision must be memorialized in an 'official' communication, in order for the employer's decision to be 'final.'" *Flannery*, 354 F.3d at 640-41.

Plaintiff argues the November 4 email was not the company's "official position" because it was not blessed by Buffet or Liegl, and because the Berkshire Code of Conduct protected him from retaliation. (DE # 91 at 10-11.) Although not clearly articulated in this portion of his brief (*Id.* at 10-11), plaintiff also appears to argue that he believed Buffet was the only one who could terminate him, thus preventing the November 4 email from constituting the company's "official position" (*See id.* at 5). In order to determine whether plaintiff's "official position" arguments have any merit, the court must determine whether plaintiff's subjective beliefs about the November 4 email have any impact on this analysis.

In *Ricks*, the Supreme Court stated "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." *Ricks*, 449 U.S. at 261. Additionally, in *Kuemmerlein v. Board of Education of Madison Metropolitan School District*, the Seventh Circuit held that the statute of limitations period begins to run when an employee is terminated, even if there is a good chance that employee will be rehired within the next few months. 894 F.2d 257, 260 (7th Cir. 1990). In that case, the plaintiffs argued that they were not "irrevocably terminated" when they received their termination notices because their employer, a school district, had a practice of rehiring more than fifty percent of the teachers it had

48

laid off. *Id.* The Seventh Circuit rejected that argument, noting the need for bright lines when dealing with the statute of limitations. *Id.*

These two cases prompted one Seventh Circuit district court to come to the conclusion that "any subjective belief that the layoff decision was not final is simply not relevant." *Libri v. Quinn*, No. 06-3167, 2010 WL 2836802, at *5 (C.D. Ill. July 15, 2010), *aff'd sub nom. Draper v. Martin*, Nos. 10–2837, 10–3054, 2011 WL 6880357 (7th Cir. Dec. 30, 2011). The court agrees with the *Libri* court. The fact that plaintiff believed the November 4 email from Lowe was somehow not final or not an "official position" because it did not state it was blessed by Buffet[28] or Liegl,[29] or that the Berkshire Code[30]

---

[28]     Plaintiff believed Buffet was the only person that could terminate his employment. (DE # 91 at 5.) Plaintiff asserts that Warren Buffet told plaintiff that he (Buffet) was the only person that could hire or fire a CEO of a Berkshire subsidiary. (DE # 94 at 3.) However, Buffet never appointed plaintiff to the position of CEO at Forest River. Plaintiff negotiated with Liegl over the CEO position (DE # 5 at 7), and plaintiff has not argued that Buffet had anything to do with plaintiff being hired as CEO. Additionally, plaintiff does not allege that Buffet told him that Liegl lacked authority to terminate plaintiff (DE # 91 at 3); plaintiff only asserts that Buffet told him that Buffet had the sole power to hire or fire the CEO of a Berkshire subsidiary. (DE # 94 at 3.)

[29]     Liegl had in fact made the decision to terminate plaintiff, and he directed Rowe to inform plaintiff of the decision. (DE # 31-1 at 2.) Additionally, plaintiff never questioned Rowe's authority to terminate his employment in any of the emails Rowe and plaintiff exchanged. (DE # 91-1 at 30-31.)

[30]     The Seventh Circuit has stated: "[A]n employer who communicates a willingness to later change a *final* decision of termination, as through an appeals process, does not render a decision 'tentative' and not final for the purposes of beginning the limitations period." *Flannery*, 354 F.3d at 637 (emphasis in original); *see also Ricks*, 449 U.S. at 261 ("[T]he pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods.") Plaintiff did not file a complaint via the Code. (DE # 30-3 at 4.) Even if he

49

prevented the decision, is not relevant. Plaintiff had been told in an email from Forest River's director of human resources that "the decision had been made that you would no longer be employed by Forest River." (DE # 91-1 at 30.) Plaintiff knew, or should have known, that this meant that a decision was made that he would be terminated. *Clark v. Resistoflex Co.*, 854 F.2d 762, 765 (5th Cir. 1988) ("Determination of when notice has been communicated to an employee is based upon an objective standard, focusing upon when the employee knew, or reasonably should have known, that the adverse employment decision had been made.").

Plaintiff also argues that neither the November 3 meeting nor the November 4 email constituted a final, definitive, or unequivocal notice of plaintiff's termination, (DE # 91 at 11.) As noted above, "[d]etermination of when notice has been communicated to an employee is based upon an objective standard, focusing upon when the employee knew, or reasonably should have known, that the adverse employment decision had been made." *Resistoflex Co.*, 854 F.2d at 765. Additionally, "the relevant inquiry is not on the subjective state of mind of the plaintiff, but rather, on the sufficiency of the notice plaintiff received." *Id.* at 766.

Several other courts have analyzed when final notice has been given to an employee. For example, in *Economu v. Borg-Warner Corp.*, the district court dismissed the plaintiff's ADEA claim because it was untimely. 829 F.2d 311, 312-14 (2d Cir. 1987).

---

had, it would not have tolled the limitations period, as it would not have rendered the termination decision tentative. *Flannery*, 354 F.3d at 637.

The defendant's[31] CEO sent the plaintiff a new organizational chart indicating that the plaintiff's duties would be scaled back. *Id.* at 313-14. The plaintiff met with the CEO a few days later, directing the CEO to communicate the plaintiff's position with the company to the plaintiff's attorney. *Id.* at 314. The CEO met with the plaintiff's attorney two weeks after that, informing the attorney that the defendant was "no longer interested in [the plaintiff's] services."*Id.* The Court of Appeals determined that the discriminatory conduct was made apparent to the plaintiff, at the latest, when the CEO met with the plaintiff's attorney and indicated to the attorney that the plaintiff's services were no longer required by the defendant. *Id.* at 315-16.

In contrast, in *Clark v. Resistoflex Co.*, the Fifth Circuit reversed a district court that had held the plaintiff's ADEA claim was untimely. *Resistoflex Co.*, 854 F.2d at 765-67, 771. The plaintiff in that case had received a call from his immediate supervisor informing the plaintiff that he was going to fire him. *Id.* at 764. Immediately after that conversation, the plaintiff spoke to one of the defendant's personnel employees, who told the plaintiff that he would soon receive a letter that would "'clarify his status'" with the defendant. *Id.* He received the letter, which detailed the terms of his termination, a few days later. *Id.* The district court held that the plaintiff had received notice of his termination on the date he had the conversation with his supervisor. *Id.* at 765. The Fifth Circuit disagreed, noting that the plaintiff did not know whether his

---

[31]     The plaintiff actually sued his former employer and his former employer's parent company. *Economu*, 829 F.2d at 312. The CEO worked for the plaintiff's former employer. *Id.* at 313.

supervisor was acting under the authority of the defendant, and that immediately after his conversation with his supervisor, the plaintiff was told by the personnel department that he would be receiving a letter clarifying his status. *Id.* at 766.

Similarly, in *Trumbull v. Health Care and Retirement Corp. of America*, the defendant argued that a memorandum one of its regional directors issued recounting a visit to the plaintiff's job site and informing the plaintiff that his "continued employment . . . [would] be based upon the findings during [job site visits]" triggered the ADEA limitations period. 756 F. Supp. 532, 534-35 (M.D. Fla. 1991). The district court rejected that argument, stating: "[T]he language in the [regional director's] memo [was] sufficiently vague as to Plaintiff's future in the company. The language did not convey conclusively that a decision had been made to discharge Plaintiff." *Id.* at 535-36. Additionally, at the time the memo was written, no decision had been made to terminate plaintiff's employment, and the person who wrote the memo did not have the authority to terminate plaintiff's employment by himself. *Id.* at 536.

The case at hand is significantly different from the *Trumball* and *Resistoflex* cases, where notice was found to be lacking. Here, in contrast with *Resistoflex,* plaintiff was not told he was fired by his immediate supervisor. *Resistoflex Co.*, 854 F.2d at 764. Rather, he was told he was terminated by Jeff Rowe, defendant Forest River's director of human resources. (DE # 91-1 at 30.) A termination message from the director of human resources, a department traditionally associated with hiring and firing decisions, is much more authoritative than a termination message from a direct supervisor.

Although there may be an argument that the "unravel the employment situation" language from Rowe's November 4 email to plaintiff is similar to the "clarify his status" language the plaintiff in *Resistoflex* got from the personnel department, the fact remains that the plaintiff in *Resistoflex* had received mixed signals, and here, plaintiff did not. *Resistoflex Co.*, 854 F.2d at 764; (DE # 91-1 at 30). The plaintiff in *Resistoflex* was told he was fired, and was then told by someone in the personnel department that he would get a letter clarifying his status with the company. *Resistoflex Co.*, 854 F.2d at 764. Here, by contrast, plaintiff was told he was fired and was then told by the same person, the director of human resources, that the parties needed to work to "unravel the employment situation." (DE # 91-1 at 30.) The "unravel" language is not inconsistent with a termination decision, and both the "unravel" language and the termination decision were communicated to the plaintiff at the same time by the same person.

Additionally, the language in Rowe's November 4 email is not vague like the language in the memo in *Trumball*. *Trumball*, 756 F. Supp. at 534-35. The language from Rowe's email ("the decision had been made that you would no longer be employed by Forest River") leaves nothing to the imagination. (DE # 91-1 at 30.) Plaintiff knew, or should have known, that this meant that a decision was made that he was terminated. *Resistoflex Co.*, 854 F.2d at 765. In sum, the facts of this case are more in line with the *Economu* than with *Trumball* and *Resistoflex. Economu,* 829 F.2d at 312-14.

Plaintiff argues that the policy behind requiring unequivocal notice to trigger the statute of limitations supports his argument. Plaintiff points to the *Flannery* court's

statement that: "Requiring employees like [plaintiff] to file EEOC charges on the basis of ambiguous conversations regarding termination would cause a flood of false charges; litigants would be forced to file a charge at every hint of termination in order to preserve their claims." *Flannery*, 354 F.3d at 641. However, the concern the Seventh Circuit expressed in *Flannery* does not apply to this case. This is not a case where the plaintiff had to try to interpret vague or mysterious messages about future employment from his employer. Plaintiff was sent an email from the director of his employer's human resources department that stated that a decision had been made that he would no longer be employed at Forest River. This was not a "hint of termination" and does not trigger the concerns set forth in *Flannery*.

Plaintiff's next arguments come from the November 19, 2008, letter. (DE # 91 at 11.) Plaintiff argues that because a terminated employee has no leave rights, and because Rowe's November 19 letter addressed plaintiff's eligibility for leave, plaintiff was not terminated on November 3. (DE # 91 at 11.) Plaintiff also argues that the November 19 letter did not address COBRA rights, "which would be indicative of a termination of employment." (DE # 91 at 11.) These arguments have no merit. The Seventh Circuit has stated: "[T]he significant date for purposes of *Ricks* and the limitations period is that date upon which the employee receives notice of termination and not the date upon which the termination becomes effective." *Mull*, 784 F.2d at 290; *see also Ricks*, 449 U.S. at 258. It is immaterial that plaintiff's termination was not effective on November 3 or 4. He was given notice that the termination decision had been made on November 4, 2008.

Plaintiff's next argument is that if the November 3 meeting or the November 4 email had been sufficiently clear, there would be no need for the November 19, 2008, or January 9, 2009, letters. (DE # 91-1 at 11.) Additionally, plaintiff argues there would be no need to discuss plaintiff's eligibility for leave or COBRA rights if the meeting or email had been clear. (*Id.*) However, neither the January 9 letter nor anything plaintiff has alleged about the November 19 letter cast any doubt on the clarity of the November 4 email. (DE # 91-1 at 30) ("[T]he decision had been made that you would no longer be employed by Forest River.").

Plaintiff further argues that his November 13, 2008, email to Rowe indicates that the notice of termination he received was not unequivocal.[32] (DE # 91-1 at 11-12.) He cites to *Dvorak v. Mostardi Platt Associates, Inc.* in support of this argument. 289 F.3d 479 (7th Cir. 2002). In that case, the plaintiff was told by superiors that he should go on FMLA leave, but he resisted the idea. *Id.* at 482. However, his superiors made it clear that this was not optional, and the plaintiff was told he had to leave the building. *Id.* A

---

[32] The text of that email stated:

It has now been almost two weeks since we met at the hotel conference room on the morning of November 3rd. In this meeting, we agreed that we would work toward a relatively quick resolution in your words to "unravel the employment situation[.]"

Can you please provide me with an update and/or Pete's thoughts regarding potential next steps in timing[.]

(DE # 91-1 at 30.)

few weeks later, the plaintiff wrote the defendant's director of human resources inquiring into whether he had been terminated and into his status with the company. *Id.* In determining a date of termination, the Seventh Circuit noted that "[the plaintiff's] own request for clarification, likewise, tends to show that any notice he might have received of his termination was not all that unequivocal." *Id.* at 487.

However, the plaintiff in *Dvorak* had never been told about a termination decision. He had simply been told he was being placed on medical leave and asked to leave the building. *Id.* at 482. Here, plaintiff was told not to report to work and that a decision had been made that plaintiff would not longer be employed by Forest River. (DE # 91-1 at 30.) This is a stark contract to *Dvorak*, and that case lends plaintiff no support.

Plaintiff's final argument is that the Tenth Circuit's analysis in *Rzepiennik v. Archstone-Smith, Inc.* makes November 19, 2008, the earliest trigger date for the limitations period. *Rzepiennik,* 331 F. App'x at 588-90. In that case, the plaintiff, a former employee that had uncovered a possible fraud by the defendant, brought a SOX claim after the defendant offered him a bonus contingent on the plaintiff not disclosing facts about the alleged fraud and returning all documents relating to the alleged fraud. *Id.* at 586. The court found that the negotiation of an agreement between the plaintiff and the defendant could have pushed back the limitations period trigger date if the defendant had engaged in negotiations, indicating that a final decision had not been made. *Id.* at 590. However, in *Rzepiennik*, the plaintiff was not alleging that the unlawful employment action was his termination; he was alleging that the unlawful employment

action was the defendant's offer to pay him a bonus conditioned on the plaintiff not disclosing facts concerning the alleged fraud and returning all documents concerning the alleged fraud. *Id.* at 589. Here, plaintiff alleges the unlawful employment action is his termination (DE # 5 at 17), and therefore *Rzepiennik* lends him no support.

In their motion to dismiss, the FR defendants argue that plaintiff cannot invoke the doctrine of equitable estoppel to toll the 90-day filing deadline. (DE # 31-1 at 21-24.) The court need not address that argument, as plaintiff did not respond to it in his response brief. (DE # 91.) The FR defendants argue (DE # 99 at 11-12), and the court agrees, that because plaintiff has failed to respond to this argument, plaintiff concedes the doctrine of equitable estoppel does not apply in this case. *Bonte*, 624 F.3d at 466.

In sum, because plaintiff had final, unequivocal notice of the termination decision on November 4, 2008, the claim he filed with OSHA on February 17, 2009, was not timely, and the court lacks jurisdiction to hear his claim. Because the court lacks jurisdiction over plaintiff's SOX claim on account of the 90-day filing period, it will not address the FR defendants' argument that Forest River is not covered by SOX § 806. (DE # 31 at 7.)

### BERKSHIRE'S MOTION TO DISMISS PLAINTIFF'S SOX CLAIM

Defendant Berkshire has moved to dismiss plaintiff's SOX claims against it. (DE # 32.) The same analysis from the section above applies here with regard to Berkshire's motion. The court lacks subject matter jurisdiction over plaintiff's SOX claim against Berkshire. Therefore, plaintiff's SOX claim is dismissed under FED. R. CIV. P. 12(b)(1). Because the court must dismiss this claim for lack of jurisdiction, and because

the court is dismissing plaintiff's negligent misrepresentation claim against Berkshire, it need not address the remaining arguments in Berkshire's brief in support of its motion to dismiss, including Berkshire's argument that the court lacks personal jurisdiction over it. (DE # 32-1.)

## CONCLUSION

For the foregoing reasons:

1. Forest River and Peter Liegl's motion to dismiss plaintiff's state law claims (DE # 27) as the motion relates to plaintiff's breach of contract and negligent misrepresentation claims is **DENIED.**

2. The portion of Berkshire Hathaway's motion to dismiss (DE # 32) that relates to plaintiff's negligent misrepresentation claim is **GRANTED.**

3. Forest River and Peter Liegl's motion to dismiss plaintiff's Sarbanes-Oxley Act claim (DE # 29) is **GRANTED.**

4. The portion Berkshire Hathaway's motion to dismiss (DE # 32) that relates to plaintiff's Sarbanes-Oxley Act claim is **GRANTED.** Because no claims remain against Berkshire Hathaway, it is dismissed from the case.

**SO ORDERED.**

Date: February 22, 2012

 s/ James T. Moody _____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT